IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALFRED KING,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 11-7819** |
| | : | |
| **GREYHOUND LINES, INC.,** | : | |
| **Defendant.** | : | |

**M E M O R A N D U M**

**SITARSKI, M.J.**                                                    **January 28, 2014**

Plaintiff, Alfred King, brought this action against Defendant Greyhound Lines, Inc.

alleging employment discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e.[1]

Presently before the Court is the Greyhound's Motion for summary judgment. For the following

reasons, the motion will be **GRANTED**.


**I.     FACTS**

King initiated this lawsuit on December 23, 2011, alleging two theories of employment

discrimination. King contends that he suffered disparate treatment when he was denied job

training opportunities, and that he was terminated as a result of his complaining about this

discrimination. (*See* Compl. ¶¶ 27, 30.) [2] King is an African American male. (Def. Statement of

---

[1] This matter was initially assigned to the Honorable C. Darnell Jones, II. On April 10, 2012, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge under 28 U.S.C. 636(c) and Fed. R. Civ. P. 73.

[2] The Complaint labels King's cause of action as "Title VI - Race Discrimination and Retaliation." However, there is no attempt to state a claim under "Title VI" of the Civil Rights Act, which prohibits discrimination in any program or activity receiving Federal financial assistance. *See* 42 U.S.C. § 2000d.

Undisputed Material Facts ("DSOF") at ¶ 19.[3]  In the fall of 2009, Greyhound had an opening for the City Manager position in its Philadelphia, Pennsylvania terminal.  (*Id.* ¶ 35.)  Evan Burak ("Burak") is a District Manager for Greyhound whose District encompasses the Northeast region, including Philadelphia.[4]  (*Id.* ¶¶ 3, 16.)  In October, 2009, Burak hired King to serve as City Manager for Greyhound's Philadelphia bus terminal.  (*Id.* ¶¶ 37-41.)  A City Manager is responsible for overseeing the transportation processes, ensuring efficient operations, maintaining customer satisfaction, and ensuring effective employee/labor relations.  (King Dep. at 94.)

Since 2009, Greyhound's policy was to provide each City Manager with "On-Boarding" training at the beginning of their employment to ensure that he or she understood the job duties of the employees who work in their terminals.  (DSOF ¶¶ 8-9.)  The District Manager directs the City Manager's On-Boarding training, and has the discretion to tailor the training based on the specific needs of the new hire and the company.  (*Id.* ¶ 12.)  District Managers may elect to conduct On-Boarding training at the City Manager's home terminal, or may send the City Manager for part, or all, of the training at an alternative location.  (*Id.* ¶ 13.)  Consistent with his role as District Manager, Burak prepared a detailed City Manager On-Boarding Plan for King that provided details of his training topics.  (*See* Pl.'s Resp., Ex. B.)  Under Burak's direction,

_____

[3]  Where there is no dispute as to a fact contained in Greyhound's statement of facts, I cite only to the Defendant's statement.

[4]  Greyhound's United States operations are divided into seven regional districts, each of which is supervised by a District Manager.  (Decl. of Gerrod Norman, Def. Mot. Ex. A. at ¶ 4.) Each district, in turn, contains a number of terminals.  (Def. Mot. Ex. C, Dep. of Evan Burak ("Burak Dep.") at 9-10.)  Each terminal is supervised by a City Manager.  (Def. Mot. Ex. G, Dep. of Alfred King ("King Dep.") at 86-87.)

King underwent various components of the On-Boarding training in Philadelphia and in Dallas, Texas, between October 2009 and January 2010. (King Dep. at 118-135.) King contends that his training deviated from the schedule provided in the City Manager On-Boarding Plan, and that he never received training in several areas listed in the On-Boarding Plan.[5]

At the time Burak was hired by Greyhound in 2008 as District Manager for District 1, the following City Managers reported to him: Howard Nice (Caucasian), Raymond O'Neil (Caucasian), Odett Luszcz (Caucasian), Dayna Hicks (African-American), Vivian Manderville (African-American), and Janice Logan (African-American). (DSOF ¶ 17.) Each of these managers received their training from District Managers who preceded Burak's being hired by Greyhound. (*Id.* ¶ 20.) Once he began serving as District Manager, Burak hired the following individuals as new City Managers for terminals in his district: Plaintiff King (African-American) on October 9, 2009, Joseph Mulvenna (Caucasian) on February 1, 2010, Donald Clapp (Caucasian) on April 5, 2010, Linda Lombrozo (bi-racial) on August 16, 2010, and Rod Gibson (African-American) on June 15, 2011. (*Id.* ¶ 19.) At the time he was hired, Burak continued the pre-existing practice of having new City Managers receive their On-Boarding training in their home terminals. (*Id.* ¶ 21.) In January 2010, Burak attended a company conference at which he spoke with other District Managers who recommended that new hires be

---

[5] Plaintiff testified that he never received initial training in the following areas: Customer Service: Handling Complaints; Driver Operations: Route Guide, Dispatching, On-Time Performance and Systems; Ticketing: Counter Procedures and TRIPS; Driver Training: VRU Procedures; Baggage Handling: Procedures, Transactions, Observation and Hands-On Practice, and Claims Processing; GPX; Management Skills: Capacity Planning; Road Checks; Corporate Office: Charter Sales; and Skills Training Course. (King Dep. at 129-131.)

trained away from their home terminals, and he decided to try this approach.[6]  (*Id.* ¶  22.)

Accordingly, upon their being hired, Burak sent Clapp, Lombrozo, and Mulvenna to Richmond,

Virginia, to complete six consecutive weeks of On-Boarding training, away from their home

terminals.  (*Id.* ¶¶ 19, 23.)  After sending these three City Managers to Richmond, Burak

determined there was no real advantage to the practice, and Lombrozo informed him that she did

not find it useful to be away from her home terminal for such a long period of time.[7]  (*Id.* ¶ 26;

Def. Mot. Ex. B, Decl. of Evan Burak ("Burak Decl.") at ¶ 10.)

     Thus, when he Burak hired King in the fall of 2009, Burak sent him to Dallas, Texas

---

   [6]  I note that King disputes the factual assertions contained in DSOF ¶ 22.  He argues that

    Defendant has offered a self-serving assertion of when and why District Manager
    Evan Burak decided to start sending new City Managers to Richmond for On-
    Boarding Training but fails to substantiate this claim with evidence other than Mr.
    Burak's own declarations [sic].  (Exhibit A).  Moreover, when Mr. Burak was
    asked at his deposition why he did not send Plaintiff to Richmond to train he
    stated, "Sending him [Plaintiff] to Richmond was not valuable" based on
    feedback he had received from other people he had already sent to Richmond. . . .

Burak's Declaration is competent evidence upon which a summary judgment movant may rely to
support its motion.  *See* Fed. R. Civ. P.  56(c)(1)(A), (4).  While he argues the Declaration is
self-serving, King does not cite to any evidence in the record to contradict "Burak's own
declarations."  Notably, the portion of Burak's deposition testimony cited by King is clearly
taken out of context.  The questioning that preceded the quoted portion concerned the training of
City Managers who were hired after Burak attended the January 2010 conference, and who,
consistent with Burak's decision to try this approach, were sent to Richmond.  The record is
undisputed that, at that time, King had already undergone his On-Boarding training.  Thus, it is
clear that the context of Burak's testimony that it was not "valuable" to send King to Richmond,
is that it was not valuable to send him to Richmond because he had already been trained.
Because King has offered no competent evidence to contradict Burak's factual statement, I
consider it undisputed.  *See* Fed. R. Civ. P.  56(e)(2).

   [7]  King disputes the assertion that Burak did not see any benefit in sending new City
Managers to Richmond for six weeks of training.  However, he cites nothing in the record to
support his counter assertion.  Accordingly, I consider it undisputed.  *See* Fed. R. Civ. P.
56(e)(2).

(Greyhound's headquarters) for only part of his training.  (DSOF ¶ 64.)  Throughout 2010, Burak tried the practice of sending newly-hired City Managers to Richmond for the training.  Burak thereafter determined that the practice of sending new hires away for six weeks was not valuable. Burak sent King's successor as the Philadelphia City Manager, Rod Gibson (hired in June 2011), to Richmond for only part of his training, and Burak oversaw the remainder of his training in Philadelphia.  (*Id.* ¶ 27.)

King has identified Clapp, Lombrozo, and Mulvenna as non-African-American managers who received specialized training that he was denied.  (*Id.* ¶ 24.)  Greyhound asserts as fact that, under Burak's direction, Lombrozo, Clapp and Mulvenna each received the same substantive On-Board training in Richmond, Virginia that King received in Philadelphia.  (DSOF ¶ 25.) King disputes this assertion, stating that these individuals received six-week comprehensive training, while his own training was more abbreviated and erratic, and that he never received training in the areas noted above.  (PSOF ¶ 25.)

In April 2010, Burak provided King with an oral evaluation, during which he gave Plaintiff a satisfactory performance evaluation and awarded him a 1% pay raise.  (*Id.* ¶ 87.) Burak identified areas in which King should work on improving his job performance.  (*Id.* ¶ 88.) In May 2010, Plaintiff met with Human Resources Manager Kelly Storm.  (*Id.* ¶ 89.)  Storm expressed that King was "disconnected regarding the gravity of each topic" that she raised with him, and memorialized that she was "concerned with [Plaintiff's] daily contribution to the Philadelphia team," noting that "[i]t appears that he is practically and mentally cut-off from the operation."  (*Id.* ¶¶ 91-92.)  She also found that King was "unaware of basic principles of marrying equipment and resources and employee/customer experience."  (*Id.* ¶ 92.)

Burak gave Plaintiff his first written performance evaluation on October 29, 2010.  (*Id.* ¶ 94.)  Burak found that Plaintiff met or exceeded standards in five areas and had a "can do attitude," but also noted that he needed improvement in "decision making, planning and organization, quality, staffing & direction, and leadership."  (*Id.* ¶ 95.)  King testified at his deposition that he could not answer yes or no to whether, in his own mind, he believed that he had experienced racial discrimination with regard to the October 2010 performance evaluation. (King Dep. 229-30.)

Greyhound contends that King exhibited various performance issues in the early months of 2011.  On January 5, 2011, King arrived seven hours late for a scheduled meeting with Burak. (DSOF ¶ 103.)  In February 2011, King hired an employee who had not yet passed a criminal background check.  (*Id.* ¶ 110.)  King knew that company policy prohibited hiring an employee before that candidate passed a criminal background check.  (*Id.* ¶ 111.)  Greyhound subsequently learned that the employee had been convicted of a sex offense involving a minor.  (*Id.* ¶ 113.) The employee worked as a janitor, and would need to work unsupervised in the terminal restrooms.  (*Id.* ¶ 112.)  After learning of the sex offense conviction, King's reaction was to ask Burak to keep the janitor employed.  (*Id.* ¶ 114.)  Hiring this employee created a liability risk for Greyhound.  (*Id.* ¶ 116.)  King conceded at his deposition that using good judgment was important part of his job, and that hiring this employee was not his "best judgment."  (King Dep. at 285-87.)

Greyhound utilizes a City Manager's Driver Out of Service ("DOS") statistic as a critical metric to gauge performance.  (DSOF ¶ 123.)  DOS refers to the daily record of drivers supervised by the City Manager who are absent or unable to drive.  (*Id.* ¶ 124.)  Every terminal is

6

instructed to maintain a DOS rate at no higher than 7%.  (*Id.*)  Throughout King's time as City

Manager, the DOS rate at the Philadelphia terminal was inconsistent, and sometimes rose to the

double digits.  (*Id.* ¶ 125.)  Burak asked King to create a spreadsheet to track his DOS rate, but

King failed to complete the spreadsheet.  (*Id.* ¶ 126.)

     In light of King's performance issues regarding his being seven hours late for the meeting

with Burak, his hiring the convicted sex offender, and his failing to create the DOS spreadsheet,

on February 11, 2011, Burak presented King with a Performance Improvement Plan, which

warned that failure to improve would be grounds for termination.  (*Id.* ¶ 127; Def. Mot. Ex. W.)

King testified at his deposition that he recalled telling Burak on February 11, 2011, that he felt

"singled out."  (King Dep. 306-09.)[8]

---

[8]  King testified at his deposition as follows:

Q.     As of February 11, 2011, except for the question about singling you out,
which you're going to come back to in a moment, had you ever said
anything else whatsoever to Mr. Burak about race?

A.     Before that no.

     . . .

Q.     During this conversation you had with Mr. Burak on February 11, 2011,
did the word "black" ever come out of your mouth?

A.     Not that I can remember.

Q.     Did it come out of Mr. Burak's mouth?

A.     Oh, no.

Q.     how about the term "African-American"?

A.     No.

Q.     Any other term that means black or African-American come out of your
mouth?

A.     I can't remember.

Q.     Did any other term that means black or African-American come out of Mr.
Burak's mouth?

A.     I don't remember.

Q.     So the only thing you said about race in your view during the whole
conversation was when you asked him why are you singling me out?

A.     Why are you singling me out, yes.

On March 24, 2011, Mr. Burak gave Plaintiff a performance evaluation marking his approximate year and a half on the job.  (DSOF ¶ 140; *see also* Def. Mot. Ex. V (copy of March 2011 Performance Evaluation)).  Burak stated that King "has not been successful in Key Performance Indicators" and that rated him as either "unsatisfactory" or "needed improvement" in most of the competency categories.  (*Id.* ¶ 141.)  No one else reporting to Burak in 2011 received a performance evaluation with a score as low as King's score in 2011.  (*Id.* ¶ 142; Burak Decl. ¶ 26.)  King sent an email to Burak after receiving the performance evaluation stating that he felt "singled out."  (DSOF ¶ 143.)  Although in the email he does not use the words "race discrimination," King testified that he intended the comment in the email that he felt "singled out" to refer to race discrimination.  (King Dep. at  368.)  He also wrote in the email that his "supervisors have over 75 years of experience between them and if I have to babysit them, then I don't need them."  (Def. Mot. Ex. CC.") King testified that, with "20/20 hindsight, it probably wasn't appropriate" to refer to Burak in that manner.  (King Dep. at 368.)

On March 30, 2011, Burak sent King an e-mail regarding the low "mystery shop" scores the Philadelphia terminal had recently received.  (DSOF ¶ 149; *see also* Def. Mot. Ex. DD (March 30, 2011 e-mail from Burak to King)).  These scores were below the district average. (DSOF ¶ 150.)

---

Q.  What did he say when you asked him that question?
A.  He just walked away.  Write your comments on the back.  That's all he said.
Q.  And when you wrote you comments on the back, you didn't say anything whatsoever about race?
A.  I didn't write that down, no.

(King Dep. at 307-309.)

8

Burak made the decision to terminate King's employment on April 1, 2011. (*Id.* at ¶ 151; *see also* Def. Mot. Ex. EE (Termination Notice)). The Termination Notice, which was drafted by Human Resources Manager Gerrod Norman, cites King's hiring of the sex offender, his seven-hour late arrival for his meeting with Burak, and his failure to manage his inconsistent DOS rate as grounds for his termination.[9] (Def. Mot. Ex. EE; *see also* Burak Dep. at 259; DSOF ¶ 151-52.) King has not identified any City Manager who reported to Burak that had hired an employee before that person passed a background check, who had hired a convicted sex offender, or who had hired a felon. (King Dep. at 289-99.) King could not identify any City Manager who reported by Burak whose performance record was worse than his own as of April 1, 2011. (*Id.* at 387-88.)

On June 15, 2011, Burak selected Rod Gibson, an African-American, to replace King as City Manager. (DSOF ¶¶ 159-160.) As noted previously, Mr. Gibson was sent to Richmond for half of his On-Boarding training and received the other half at the Philadelphia terminal. (*Id.*)

As noted, King has identified Linda Lombrozo, Donald Clapp and Joseph Mulvenna as non-African-American comparator City Managers. It is undisputed that Burak has disciplined Lombrozo with respect to her inconsistent DOS record and other performance issues. (DSOF ¶ 166.) Lombrozo, who oversees the Port Authority terminal in New York City, manages approximately three times the number of drivers that King managed. (*Id.* ¶ 167.) Burak has

---

[9]  King disputes that these issues were the true cause for his termination. He asserts that his performance issues were caused by Burak's "decision to not provide Plaintiff with the same training as he did other City Mangers," which set King "up for failure." (*See also* PSOF at 151 (citing King Dep. 129-31); Pl.'s Resp. at 6.) I note that in the cited portion of King's Deposition he testified regarding the subjects on which he felt his training was deficient. However, he did not specifically testify that these deficiencies "caused" his performance issues.

provided performance counseling in the form of written documentation to both African-American and Caucasian managers in a manner similar to the February 2011 performance improvement plan that he provided to King.  (*Id.* ¶ 168.)


## II.     STANDARD OF REVIEW

Under Fed. R. Civ. P.  56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.  56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  An issue is genuine if the fact finder could reasonably return a verdict in favor of the nonmoving party with respect to that issue.  *Anderson*, 477 U.S. at 249.  In reviewing a motion for summary judgment, the court does not make credibility determinations and "must view facts and inferences in the light most favorable to the party opposing the motion."  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).


## III.    DISCUSSION

Title VII protects employees from discrimination by their employers on the basis of race, color, religion, sex or national origin.  42 U.S.C.2000e-2; *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000)  A plaintiff, like King, who relies on circumstantial evidence in support of his discrimination claim (*see* Pl. Resp. at 3-4 (arguing only a circumstantial evidence claim of race discrimination)), must satisfy the test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, the plaintiff has the burden of establishing a *prima facie* case of discrimination.  Second, if the plaintiff succeeds in meeting this burden, a burden of production arises on the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  Third, should the defendant carry this burden, to defeat the entry of summary judgment, plaintiff must create a genuine issue of material fact that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997).  Stated another way, if a defendant offers a legitimate, non-discriminatory reason for its actions, plaintiff survives summary judgment by proffering "admissible evidence [ ] that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason," or by "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999).

To establish a *prima facie* case of race discrimination, a plaintiff must demonstrate that:

(1) he is a member of a protected class;[10] (2) he was qualified for or satisfactorily performed the duties required by his position; (3) he suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably or the adverse job action occurred under circumstances giving rise to an inference of discrimination. *See Jones*, 198 F.3d at 410-11; *Langley v. Merck & Co.*, 186 Fed. App'x 258, 259 (3d Cir. 2006); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). The ultimate burden of persuasion always remains with the plaintiff, and the ultimate question is whether, after all the evidence is in, the plaintiff has proven his case by a preponderance of the evidence. *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). Even during the pretextual analysis, the employer has no burden to prove that its proffered reasons are true; rather, the burden is on the plaintiff to show a genuine issue of material fact exists that the proffered reasons are pretextual. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Plaintiff's claim of race discrimination is based upon two related theories: (1) that Greyhound discriminated against him on the basis of his race when it refused to allow him to attend mandatory training that was necessary for him to succeed in his position while permitting non-African-Americans in his position to attend the training; and (2) that Greyhound terminated his employment when he complained about this discriminatory treatment. (Compl. at ¶¶ 27, 30, 37.) I will discuss each claim separately.

**A.    Denial of Training**

King's first theory of liability under Title VII is that Burak discriminated against him on

---

[10] There is no dispute that King, an African-American male, satisfies the first prong of the *prima facie* case.

the basis of race when he refused to allow him to attend On-Boarding training.  A discriminatory denial of training can be an adverse employment action.  *See* 42 U.S.C. § 2000e-2(d) (stating it shall be an unlawful employment practice for any employer to discriminate on the basis of race in any program established to provide training); *Pajic v. Cigna Corp.*, Civ. A. No. 89-2404, 1990 WL 191939, at *9 (E.D. Pa. Nov. 30, 1990) (stating that a company's denial to plaintiffs of certain training opportunities . . . constitutes an adverse employment action, or discrimination."); *Briody v. Am. Gen. Fin., Co.*, Civ. A. No. 98-2728, 1999 WL 387269, at *2 (E.D. Pa. May 28, 1999); *see also Thompson v. Butterball LLC*, Civ. A. No. 10-127, 2012 WL 1094809, at *5 (E.D. Ark., Mar. 30, 2012) (addressing failure to train as a separate cause of action even though "one would normally make in support of a pretext argument").  Greyhound argues that it is entitled to summary judgment because King has failed to satisfy his burden of presenting evidence showing: (1) that he suffered any adverse employment action based upon the alleged denial of training, (2) that he satisfactorily performed his duties, (3) that a comparator manager received more favorable treatment, or (4) that Greyhound's proffered reason for training him in the manner in which it did was a pretext for discrimination.

### 1.  King's *Prima Facie* Case

Greyhound's first argument, that King failed to meet his summary judgment burden to show that he suffered a denial of training, is based on its characterization of King's claim that he was denied On-Boarding training *in Richmond*.  (Def. Mem. 5-6.)  To support this argument, Greyhound points to deposition testimony where King conceded that he was provided with most of the components of On-Boarding training at the Philadelphia terminal or in Dallas during the first weeks of his employment.  (Def. Mem. at 5-6.)  This argument misconstrues both the nature

13

of King's failure to train claim and the record.  King does not assert disparate treatment based on *where* he was trained.  Rather, his claim is based on the disparity between the comprehensive training that comparator managers allegedly received, versus the "abbreviated and erratic overview" that he allegedly received on site in Philadelphia and in Dallas on the subjects listed in Footnote 5, *supra*.  While Greyhound points to deposition testimony where King states that he was able to learn several of the training topics without formal training (*see, e.g.,* King Dep. at 119-121 (conceding that he learned CARE and PLEASE topics by watching videos); 129-30 (stating he learned "new hire paperwork "down the line" and learned baggage handing "on my own"); 131-32 (stating that he "eventually" learned to use the route guide); 133 (stating that he "eventually" learned to operate the customer service office); 143-44 (stating that he "learned a little" about driver planning)), there are numerous other topics as to which he contends he received no training and was never able to learn about on his own (*see, e.g., id.* at 129 (stating he never received training in payroll); 144-45 (stating he was never trained to use the BOSS system); 171 (stating he was never trained on the TRIPS system)), which he asserts caused his poor performance.  Based on this record, I find that King has met his burden to demonstrate that genuine issues of material fact exist on whether there was disparate treatment in the manner in which he was trained.

Greyhound's second argument on the failure to train claim is that King has not met his summary judgment burden of demonstrating the second prong of the *McDonnell Douglas* test, namely that he performed his job duties acceptably.  Because King has offered his own testimony to support his claim that his performance issues occurred as a result of Burak's decision to deny him adequate training, I find that he has met his summary judgment burden on

14

the second prong.

Next, Greyhound argues that King has failed to meet his summary judgment burden on the third *McDonnell Douglas* prong of showing that a similarly situated[11] comparator manager, who was not a member of the protected class, was treated more favorably with respect to the On-Boarding training. Greyhound argues that the three City Managers whom King has identified as comparators, Clapp, Mulvenna and Lombrozo,[12] were not similarly situated to King because they were hired after Burak decided in January 2010 to start sending new City Managers to Richmond. Greyhound notes that King, who was hired in 2009, had received almost all of his training before Burak decided to send newly hired City Managers to Richmond. I find that this assertion, while relevant to the next question of whether Greyhound had a legitimate non-discriminatory reason for the difference between King's training and that of the comparators, does not speak to whether they were they were similarly situated or treated more favorably. The issues concerning where City Managers were trained and how they were trained, are distinct inquiries from whether they received superior training, and thus were treated more favorably. Because King has established a genuine issue of material fact that he did not receive complete

-------

[11] The determination of who constitutes a "similarly situated" employee is fact intensive, and looks to things such as job function, level of supervisory responsibility and salary. For King's denial of training claim, I find that "similarly situated" employees are City Managers who were directly supervised by Burak. *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 306 (3d Cir. 2004) (finding that two employees having the same job responsibilities were similarly situated even though they were stationed in differed regions).

[12] While King asserts that Lombrozo is a similarly-situated, non-protected comparator employee, the record reflects that she is bi-racial and thus is arguably a member of King's protected class. However, this does not defeat King's *prima facie* case, *see Goosby*, 228 F.3d at 321 ("[c]learly, an employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class"), since there is no dispute that the other two comparators are not African-American.

On-Boarding training, while his comparators did, he has satisfied his summary judgment burden

on this prong of his *prima facie* case.

> **2.     Greyhound's Articulated Reason for its Adverse Employment Action**

Having found that King has met his summary judgment burden of establishing a *prima*

*facie* case, I next consider whether Defendant has met its burden of articulating a valid, non-

discriminatory reason for its decision to terminate him.  Greyhound has set forth the following

explanation for why King was not sent to Richmond for training:

> It was not until Mr. Burak spoke to his peer, District 3 Manager Emma Gray, in
> 2010 that Mr. Burak even considered the possibility of sending *new* City
> Managers to Richmond for their On-Boarding training.  By that time, Mr. King
> had already been working as a City Manager for approximately three months, and
> had already received all, or almost all, of his On-Boarding training in Philadelphia
> and in Dallas.  Thus, the reason that Mr. Burak chose not to send Mr. King to
> Richmond for training had nothing to do with race.  Indeed, Mr. Burak treated
> Mr. King exactly the same way he treated all other City Managers hired before
> January 2010 (most of whom were white): because they had already been trained,
> Mr. Burak chose not to send those managers to be trained in Richmond.

(Def. Mem. at 11-12 (emphasis in original)).  As noted above, Burak discontinued the practice of

sending City Managers to Richmond for the full six weeks after Mulvenna, Clapp and Lombrozo

had completed their training, based on feedback they provided to the effect that sending the City

Managers away from their home terminals for the full six weeks of training was not valuable.

(Burak Decl. ¶ 10.)  I find that Greyhound has met its summary judgment burden of articulating

a legitimate non-discriminatory reason to explain the disparate manner in which King and his

comparators were trained.

> **3.     King's Burden on Pretext**

Greyhound satisfied its burden of articulation; thus, it was incumbent upon King to create

a genuine issue that this explanation was a pretext for intentional discrimination.  The only fact

King cites to support his burden that Burak's explanation is a pretext for discrimination, is that Burak later sent King's replacement, Rod Gibson, to Richmond after he had allegedly already determined that such training was not valuable.  (*See* Pl. Resp. at 9 (asserting that he has created a genuine issue of material fact that Burak's proffered reason is a pretext for discrimination because "he on the one hand is saying it would not be valuable for Plaintiff to receive the training and then he contradicts that stated belief by sending Rod Gibson")).  I find that this assertion is insufficient to meet King's burden on the pretext issue.

The summary judgment record shows that Rod Gibson, who was hired as Plaintiff's replacement, only received part of his training in Richmond, with the other part occurring at his home terminal in Philadelphia.  (DSOF ¶ 27.)  In other words, Gibson's training was completely consistent with Burak's assertion that he grew to believe it was not valuable for new City Managers to spend the full six weeks away from his or her home terminal, based on the feedback he received from employees who had gone that route for their training.  Thus, the fact that Gibson was sent to Richmond for *part* of his training, does not impugn as pretext Burak's explanation that it was not valuable to send newly hired City Managers away from home for their *entire* training.

Moreover, King cannot create a genuine issue on pretext by relying on the training received by the other comparator City Managers who received the six week away-from-home training.  While King's reliance on the inference created by evidence that similarly situated individuals received different training suffices to establish his *prima facie* case, it is not sufficient to establish pretext.  *See Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998) (stating that an "inference based on favorable treatment of one member of a protected group may

be sufficient to establish a *prima facie* case but not at the pretext stage where the inquiry into discriminatory motives rises to a new level of specificity") (internal citations omitted).  Notably, of the twelve City Managers under Burak's supervision, seven of them (four Caucasians and three African-Americans) did <u>not</u> receive six weeks of away-from-home training, two (King and Gibson who are both African-American) were partially trained away-from-home, and three (two Caucasian and one bi-racial) received six weeks of away-from-home training.  Thus, both protected and non-protected members received all of their training away-from-home, just as both protected and non-protected members were trained in whole or in part at their home terminals.  Such pattern evidence, without more, is not sufficient to establish an inference of discrimination.  *See id.* at 646 (agreeing that merely showing evidence of a pattern, "'being random with respect to race, is not evidence of racial discrimination'" because "to hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably") (quoting *Bush v. Commonwealth Edison Co*, 990 F.2d 928, 931 (7th Cir. 1993)).  Accordingly, I conclude that King's reliance on two non-protected members who received six weeks of away-from-home training is not sufficient to establish pretext, when he received the same training as seven other City Managers, four of whom were outside of his protected class.

Because King has not established that Greyhound's legitimate non-discriminatory reason for not providing him with six weeks of away-from-home training was pretextual, and because there is no evidence from the record that leads to a justifiable inference of racial discrimination, summary judgment is granted on the claim of discriminatory denial of training.

18

**B.      Retaliatory Termination**

Plaintiff also claims that he was unlawfully terminated in retaliation for his having complained about discrimination in training.  (Compl. ¶ 37.)  To meet his summary judgment burden of demonstrating a *prima facie* case for unlawful retaliation, King must show:  "(1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action."  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)).  Once Plaintiff establishes a *prima facie* case, the burden of production falls on Greyhound to articulate a legitimate, non-retaliatory reason for taking the adverse action.  *See id.*  King then shoulders the ultimate burden to prove that the proffered reason was false or mere pretext, and that the real reason was discrimination.  *Id.*  Greyhound argues that King has failed to meet his summary judgment burden on his *prima facie* case.  It also argues that King has not shown that its proffered non-discriminatory reason his termination was a pretext for discrimination.

Greyhound first argues that King has failed to produce evidence that he engaged in protected activity.  It argues that merely complaining to a supervisor about being "singled out" does not constitute protected activity because it is merely a general complaint of unfair treatment and not an explicit or implicit assertion that discrimination was afoot.  (Def. Mem. at 15.)  I agree.[13]

---

[13]  King does not specifically address the argument that his complaints of being "singled out" are insufficient as a matter of law to constitute protected activity.  Indeed, King does not address any of the elements of a *prima facie* case of retaliation.

"Protected conduct includes the filing of formal charges of discrimination and informal protests of discriminatory activities, such as making complaints to management." *Warfield v. SEPTA*, 460 F. App'x 127, 131 (3d Cir. 2012) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).  Protected activity does not encompass "very generalized complaints about unfair treatment.  At a minimum, the conduct must convey a protest of discriminatory practices such that it will be understood that a complaint about an unlawful employment practice has been advanced."  *Id.* (citing *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).  The two instances where King claimed he was "singled out" cannot, as a matter of law, constitute protected activity because there is nothing in the summary judgment record to establish that these complaint could be understood as raising race discrimination as a basis for King being "singled out."

King's deposition testimony established only that he made generalized complaints to Burak about being "singled out" for unfair treatment, and never claimed that race was the cause for his being "singled out."  King never mentioned race to Burak prior to February 11, 2011, as a basis for feeling singled out.  In his February 11, 2011, conversation with Burak about his performance review in which he said he felt singled out, King never mentioned race as a cause for his feeling, Burak never referred to King's race in that conversation, and King did not mention race in his written comments in response to the performance review.  Accordingly, I find that King has failed to meet his burden with regard to the first prong of a retaliation claim.

Assuming *arguendo* that the claims of being singled out can constitute protected activity, and that King can also satisfy the remainder of his *prima facie* burden, I find that Greyhound has articulated a legitimate non-discriminatory reason for terminating King.  Greyhound asserts that

20

King was terminated on April 1, 2011 because of the many performance issues documented up to that date.  These include violating of Greyhound's hiring policy when he hired an employee who was a convicted sex offender before completing a background check, arriving seven hours late for a meeting with Burak, failing to manage his inconsistent DOS rate, and failing to improve his performance after multiple warnings.  I find that this is a legitimate non-discriminatory reason for Greyhound's decision to terminate King.  *See e.g.*, *Wooler v. Citizens Bank*, 274 Fed. App'x 177, 180 (3d Cir. 2008) (finding that poor performance is a legitimate, nondiscriminatory reason firing and employee); *Scully v. Allegheny Ludlum Corp.*, 257 Fed. App'x 535, 537 (3d Cir. 2007) (holding that discharge for performance reasons is a legitimate non-discriminatory reason); *Simpson*, 142 F.3d at 645 (same).

I also find that King has failed to meet his summary judgment burden of creating a genuine material issue that the stated reason was a pretext for intentional discrimination.  King does not dispute that the incidents cited by Greyhound occurred.  Rather, he argues that these incidents were not his fault because Burak "set him up to fail" by not sending him for six weeks of away-from-home training.  (Pl. Mem. at 8.)  I find that King's assertion that his performance deficiencies were "not his fault" is insufficient as a matter of law to meet his summary judgment burden of showing pretext.

When performance deficiencies are cited as the legitimate non-discriminatory reason for an employee's termination, an argument that these deficiencies were not the employee's fault or were due to circumstances beyond his control will not suffice to establish pretext.  *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (stating that a plaintiff "cannot survive summary judgment under this prong simply by pointing to evidence that could convince

a reasonable factfinder that he did as well as he could under the circumstances.  Rather, he 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'") (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).)  Beyond the fact that King's argument is legally insufficient, it must be stated that the record contains substantial, unrebutted factual support for Greyhound's proffered assertion that King was fired for performance deficiencies.  This includes the multiple documented performance issues that are unrelated to King's allegedly inadequate training.  For example, King offers no explanation how his training caused him to be seven hours late for a meeting with his supervisor, or any indication that he was not trained about Greyhound's policy requiring criminal background checks for new employees.  Moreover, King has not produced evidence of any other manager outside of his protected class who was not terminated despite having exhibited similar performance deficiencies.  Indeed, he admitted in his deposition that he was unable to point to any other manager who reported to Mr. Burak whose performance was worse than his as of April 1, 2011.  (*See* King Dep. at 387-388.)

Accordingly, I conclude that Greyhound is entitled to summary judgment on King's retaliation claim.

**IV.  CONCLUSION**

Plaintiff King has failed to establish that Defendant Greyhound's reasons for not affording him the same training as other managers was a pretext for racial discrimination.  He has also failed to meet his summary judgment burden of establishing a *prima facie* case of

22

retaliation or of showing that Greyhound's proffered reason for his termination was a pretext for racial discrimination.  Accordingly, Defendant's Motion for Summary Judgement will be granted.

An appropriate Order follows.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE